**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**FRIEDMAN KAPLAN SEILER**
**ADELMAN & ROBBINS LLP**
Elizabeth Bierut (N.J. Bar # 432072024)
Nora Bojar (pro hac vice forthcoming)
1 Gateway Center, 25th Floor
Newark, NJ 07102-5311
(973) 877-6400
ebierut@fklaw.com
nbojar@fklaw.com
*Counsel for Plaintiff Elysium Pharmaceuticals Ltd.*

| | |
|---|---|
| In Re:<br><br>INVATECH PHARMA SOLUTIONS LLC,[1]<br><br>        Debtor. | Case No.:    25-11482 (CMG)<br><br>Judge:       Christine M. Gravelle<br><br>Chapter:     11 |
| ELYSIUM PHARMACEUTICALS LTD.,<br><br>        Plaintiff,<br><br>vs.<br><br>INVATECH PHARMA SOLUTIONS LLC,<br><br>        Defendant. | Adversary Pro. No.: 26- |

---

[1] The last four digits of Debtor InvaTech Pharma Solutions LLC's tax identification number are 1999. The location of Debtor InvaTech Pharma Solutions LLC's principal place of business is 40 C Cotters Lane, Suite #A, East Brunswick, NJ 08816.

## ADVERSARY COMPLAINT

Plaintiff Elysium Pharmaceuticals Ltd. ("**Elysium**"), by and through its undersigned counsel, alleges, upon knowledge as to itself and its own conduct and upon information and belief as to all other matters, against Defendant InvaTech Pharma Solutions LLC ("**InvaTech**") as follows:

## NATURE OF THE ACTION

1.      Elysium is a leading pharmaceutical company in Gujarat, India that specializes in contract manufacturing and formulation development.  Since 1996, Elysium has provided critically needed medications to its domestic market and over thirty international markets, including the United States.  To service these markets, Elysium enters into supply agreements with wholesalers, traders, and distributors, including Strides Pharma Science ("**Strides**") as successor to ACI HealthCare USA, Inc. ("**ACI**").

2.      In 2017, Elysium entered into a Supply Agreement (the "**Supply Agreement**") with ACI, a generic pharmaceutical company, and ACI's parent ACI HealthCare Limited, pursuant to which Elysium manufactured bulk pharmaceutical products for ACI, which in turn marketed and distributed the packaged products in the United States.  As part of the Supply Agreement, InvaTech was responsible for packaging the products.  Among the products that Elysium manufactured for ACI was Tramadol HCL Tablets ("**Tramadol**").

3.      The sequence of events per the Supply Agreement was for (1) ACI to place product orders with Elysium, (2) Elysium to manufacture the requested product in bulk, (3) Elysium to then send the bulk product to InvaTech for packaging and delivery to ACI, and (4) ACI to distribute the final packaged products to its customers.

2

4.      The Supply Agreement stated that ACI would pay the "product price" to Elysium. In particular, payment for the product was to be made "by ACI to Elysium within 60 days from the date of the invoice."

5.      The Supply Agreement did not discuss invoicing or payment of fees to InvaTech for its packaging services.

6.      For its administrative convenience, ACI initially requested, and Elysium and InvaTech initially provided to ACI, a consolidated invoice that included both the bulk product price due to Elysium and the packaging fee due to InvaTech.  As part of this arrangement, Elysium provided InvaTech with Elysium's bulk product price, to which InvaTech added its packaging fee and invoiced the full amount to ACI.  ACI would then pay the full invoice to InvaTech, with the understanding that InvaTech would in turn remit payment of the bulk product price to Elysium.  At no point did InvaTech have a right, title or interest in Elysium's receivable from ACI, and at no point did Elysium relinquish or transfer to InvaTech its right, title or interest in that receivable.

7.      In 2022, InvaTech faced financial headwinds, driven by working capital constraints and internal mismanagement.  InvaTech stopped promptly remitting Elysium's receivable from ACI.  As a result, Elysium insisted that it invoice ACI separately and that ACI pay the bulk product price to Elysium directly.  At the time, Elysium believed that InvaTech likewise began to invoice ACI separately for its packaging fee, although Elysium has since come to question whether InvaTech simply continued to invoice ACI improperly – for both its packaging fee and for Elysium's bulk product price.  In any event, until April 2024 (until Strides

3

took over ACI's Tramadol business[2]), ACI paid Elysium's invoices to Elysium directly, so Elysium received its bulk product price from ACI.

8. In late 2023 through early 2024, InvaTech's financial condition deteriorated. By that time, the company was submerged under multiple millions of dollars of debt with no relief in sight. It was then that Nilesh Patel, the principal of InvaTech, approached Elysium about making a majority investment in the company. The parties commenced pre-deal diligence. At no point during that process did Elysium instruct InvaTech to invoice ACI for Elysium's receivable, let alone misappropriate that receivable for itself.

9. During the due diligence period, Elysium learned that InvaTech's accounting was problematic, as loans and payables were not reflected in InvaTech's books. InvaTech also concealed that it was facing significant litigation exposure.

10. In early 2025, Elysium discovered that InvaTech was improperly recording its revenue from ACI. InvaTech's books revealed that beginning in at least January 2024 (and possibly earlier), InvaTech sent first ACI, then Strides (after Strides took over ACI's Tramadol business), invoices related to the product that included both Elysium's bulk product price and InvaTech's the packaging fee. InvaTech's books further reflected that throughout 2024, InvaTech received payment from ACI/Strides for both amounts. While InvaTech's books include several entries in which it supposedly transferred the bulk product price to Elysium, these entries were false. No such transfers ever occurred.

11. When Elysium asked InvaTech why it was billing ACI/Strides for Elysium's bulk product price, Nilesh Patel claimed he was including the total revenue (bulk product price and

---

[2] As discussed below, Strides took over ACI's Tramadol business on or about March 25, 2024. After this, ACI made only one more payment to Elysium in 2024, in April 2024, in partial satisfaction of an earlier invoice Elysium had sent to ACI.

packaging fee) for internal accounting purposes only.  Nilesh Patel admitted that InvaTech did not actually transfer any funds received from ACI/Strides to Elysium, and at year-end, InvaTech reversed the debit entries for these sham transfers.  Simply put, InvaTech was artificially inflating its revenue to attract investors.

12.     Elysium promptly ended discussions with InvaTech, and the deal died.

13.     In or about February 2025, Elysium contacted Strides to inquire about Elysium's outstanding invoices for Tramadol.  Pursuant to the Supply Agreement, Elysium had continued to directly invoice ACI/Strides[3] for its bulk product price.

14.     Strides informed Elysium that since April 2024, it had been remitting payments to InvaTech in satisfaction of InvaTech's invoices for Tramadol.  Thus, as the new payor for the product, Strides had been mistakenly paying InvaTech's improper invoices in full.  Rather than remit any portion of these payments to Elysium, InvaTech pocketed the entire amount.  Elysium determined that of Strides' payments to InvaTech, $301,747.88 was Elysium's receivable (the "**Misappropriated Receivables**").

15.     InvaTech had thus successfully capitalized on the transition from ACI to the new counterparty: by invoicing Strides for Elysium's receivable, along with InvaTech's packaging fee, InvaTech was able to steal hundreds of thousands of dollars of receivables from Elysium.

16.     Along with the Misappropriated Receivables which Strides had mistakenly paid to InvaTech, Elysium had invoiced ACI/Strides an additional $350,464.13 for Tramadol.  As of

---

[3] Due to regulatory requirements in India as well as permitting requirements related to the manufacture and sale of narcotics, such as Tramadol, Elysium was required to send its invoices to ACI.  On March 25, 2024, Strides confirmed that it would be responsible for payment of those invoices.  References in this Complaint to invoices issued by Elysium to "ACI/Strides" are to the invoices Elysium issued nominally to ACI after March 25, 2024 but for which Strides was responsible.

February 2025, Elysium had not received payment from ACI/Strides on that amount (the "**Withheld Receivables**").[4]

17.     When Elysium questioned Strides about the Withheld Receivables in February 2025, Strides informed Elysium that it had received invoices for Elysium's bulk product price from both Elysium and InvaTech.  Thus, Strides was in a conundrum.  Strides decided to withhold payment on both sides' invoices until Elysium and InvaTech reached an agreement regarding ownership of the Withheld Receivables.

18.     InvaTech has not only refused to return the Misappropriated Receivables but, upon information and belief, has instructed Strides not to release the Withheld Receivables to Elysium, falsely claiming ownership of the same.

19.     InvaTech cannot justify its theft of the Misappropriated Receivables nor its attempted theft of the Withheld Receivables.

20.     This adversary proceeding seeks a declaratory judgment stating that InvaTech does not hold right, title, or interest in either the Misappropriated Receivables or the Withheld Receivables, stating that both are the property of Elysium and not of the bankruptcy estate, ordering the release of both sums to Elysium, and awarding damages to Elysium in an amount no less than the amount of the Misappropriated Receivables.

## **PARTIES**

21.     Plaintiff Elysium is an Indian limited liability company with a principal place of business in Gujarat, India.

---

[4] Elysium also invoiced ACI/Strides another $181,858 for Tramadol produced and shipped to InvaTech for packaging, but which, upon information and belief, InvaTech never packaged nor delivered to ACI/Strides. This amount is not part of either the Misappropriated Receivables or the Withheld Receivables.

22. Defendant InvaTech is a New Jersey limited liability company with a principal place of business in East Brunswick, New Jersey, and the Debtor-in-Possession in this Chapter 11 proceeding.

## JURISDICTION

23. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

24. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

25. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.   The Supply Agreement

26. On or about July 18, 2017, Elysium and ACI entered into the Supply Agreement. Pursuant to the Supply Agreement, Elysium agreed to develop, produce, and sell to ACI pharmaceutical products based on ACI's specifications and needs. One of these products was Tramadol.

27. The Supply Agreement, which was signed by representatives of Elysium, ACI, as well as InvaTech, specified that packaging for the products would be performed by InvaTech.

28. The Supply Agreement further stated that "Payment of the invoiced Product Price for Product shall be made by ACI to ELYSIUM within 60 days from the date of the invoice. All amounts payable by ACI to ELYSIUM shall be paid by wire transfer in U.S. dollars to the account specified by ELYSIUM in writing."

### II.   Invoicing of ACI

29. Sometime after entering the Supply Agreement, at ACI's request for an administrative accommodation, InvaTech and Elysium agreed to provide a single invoice to ACI.

To do so, Elysium initially provided InvaTech with its bulk product price, to which InvaTech added its packaging fee and invoiced the full amount to ACI.  ACI would then remit payment for the products (including the bulk product price due to Elysium and packaging fee due to InvaTech) to InvaTech.  InvaTech in turn was required to remit Elysium's receivable to Elysium. At no point did InvaTech acquire or obtain an interest in the receivable due to Elysium.

30.     In 2022, Elysium grew concerned that InvaTech was no longer promptly remitting the receivable to Elysium and lost trust in InvaTech.  As a result, Elysium insisted that it invoice ACI separately and directly for the bulk product price, and that ACI pay the bulk product price directly to Elysium.  ACI complied by paying Elysium's invoices directly.

31.     At all times, ACI/Strides placed purchase orders directly with Elysium.  For example, on or about August 17, 2023, ACI placed a purchase order with Elysium for products in the amount of $309,350.00.  The purchase order listed Elysium as the "Vendor."  Similarly, on or about March 15, 2024, ACI placed a purchase order with Elysium in the amount of $319,470.00.  The purchase order listed Elysium as the "Vendor," and InvaTech as the "Ship To" address.

32.     Elysium also continued billing ACI/Strides separately for the products Elysium sold to ACI/Strides, and, until April 2024 received payment from ACI/Strides for the bulk product price.  Elysium's invoices accordingly listed InvaTech as the "Ship To" address, while naming Elysium as the "Exporter."

**III.   Strides Takes Over ACI's Business with Elysium**

33.     On March 25, 2024, Shafi Rahman, ACI's CEO, sent an email to the principals of Elysium and InvaTech, titled "Announcement."  The email stated, in relevant part, that

"Effective March 25, 20[2]4, all sales and marketing activities for ACI Healthcare USA will be transferred to Strides.  With this transition, Strides will be responsible for all outstanding bills."

34.     In accordance with ACI's announcement, on or about April 30, 2024, Elysium issued an invoice to ACI/Strides, noting InvaTech as the "Ship To" address only.  The invoice was payable directly to Elysium.  Similarly, on or about July 31, 2024, Elysium issued an invoice to ACI/Strides, again noting InvaTech as the "Ship To" address only for packaging.  These practices comported with the Supply Agreement and the parties' course of dealings.

**IV.     Elysium Rejects a Proposed Investment in InvaTech When it Discovers InvaTech's Improper Financial Practices**

35.     In early 2024, Elysium learned that InvaTech was suffering from serious financial strain.  At that time, a representative of an investor in InvaTech approached Elysium with a proposal that Elysium acquire a majority stake in InvaTech.

36.     In mid-2024, Elysium commenced due diligence of InvaTech, and soon discovered its highly concerning accounting practices, financial mismanagement, and undisclosed litigation exposure.  Elysium further learned that neither InvaTech's board nor shareholders had approved the proposed investment.

37.     As part of its due diligence, in early 2025, Elysium received from InvaTech evidence of deceptive accounting practices, which, by InvaTech's own admission, were designed to mislead potential investors and lenders into believing that InvaTech's sales figures were significantly higher than they were.

38.     Specifically, on January 27, 2025, Alpesh Patel, Manager of Operations at InvaTech, sent Elysium a document titled "Tramadol Invoice – 2024."  This document was a spreadsheet purporting to show InvaTech's sales proceeds from ACI/Strides in 2024.  Each row reflected an invoice that included both the bulk product price due to Elysium and the packaging

fee due to InvaTech. Each row also reflected the "Balance" of the ACI/Strides payment that InvaTech apparently recorded as revenue.

39.     For the period January 1 through March 4, 2024, the spreadsheet showed invoices InvaTech sent to ACI and then reflected Elysium's bulk product price amount as a "debit" entry "Paid to Elysium." These rows also reflected the "Balance" amount retained by InvaTech as revenue after this purported "debit." For the remainder of 2024, with respect to the invoices InvaTech sent to Strides between July 10 and December 31, 2024, the spreadsheet reflected $0 debited to Elysium. For this period, InvaTech recorded revenue for the full amount that it had invoiced Strides, which included Elysium's receivable.

40.     Contrary to the purported "debits," Elysium did not receive a single payment for its receivable from InvaTech with respect to Tramadol in 2024. When asked for an explanation, InvaTech's CEO Nilesh Patel admitted that the spreadsheet was furnished to potential investors in an effort to show higher than actual sales figures, but that the amounts shown as "debited" to Elysium were reversed at year-end since Elysium never received those payments.

41.     Shortly after this exchange, Elysium terminated all discussion of any investment deal with InvaTech. Elysium never received, nor has it ever claimed, any ownership interest in InvaTech.

42.     Most importantly, Elysium and InvaTech never discussed that InvaTech would collect, let alone misappropriate, Elysium's receivable from Strides. Simply put, the receivable was irrelevant to the proposed investment, and at all times, remained the property of Elysium alone. In accordance with the Supply Agreement and the parties' course of dealing, Elysium continued invoicing ACI/Strides for the bulk product price of the products it manufactured.

V.    **InvaTech Invoices Strides and Steals Elysium's Receivables**

43.    As discovered by Elysium during its due diligence of InvaTech, since at least January 2024, InvaTech was improperly invoicing first ACI, and later Strides, for the bulk product price owed to Elysium, along with the packaging fee owed to InvaTech. InvaTech then misappropriated Elysium's receivable to its own account. Elysium neither approved nor authorized InvaTech's theft.

44.    Between July 2024 and February 12, 2025, upon information and belief, InvaTech received payments from Strides. Of these payments, the Misappropriated Receivables, or $301,747.88, is the bulk product price owed to Elysium. However, InvaTech has refused to release the Misappropriated Receivables to Elysium. It has instead improperly converted Elysium's property.

45.    During this period, Elysium also invoiced ACI/Strides for the bulk product price, as required by the Supply Agreement and in accordance with the parties' prior dealings. Strides declined to pay these invoices, explaining that its payments to InvaTech included the bulk product price.

46.    When Elysium demanded payment from InvaTech of the Misappropriated Receivables, InvaTech refused, falsely claiming that Elysium had "instructed" InvaTech to retain those receivables. Elysium never instructed InvaTech to retain the Misappropriated Receivables during the due diligence process or otherwise, nor would it have made sense for Elysium to do so as it received no consideration from InvaTech in exchange. On the contrary, after learning about InvaTech's deceptive accounting practices, Elysium wanted nothing to do with InvaTech.

VI.    **InvaTech Converts Receivables Belonging to Elysium Before Filing for Bankruptcy**

11

47.     On February 13, 2025, one day after InvaTech last received payment from Strides for Elysium's receivable, InvaTech filed a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code.  InvaTech listed Elysium as a creditor.

48.     As of the petition date, InvaTech had collected from Strides, and then stolen, the Misappropriated Receivables, totaling $301,747.88.  The Misappropriated Receivables are property of Elysium alone.

49.     Also as of the petition date, Strides has held the Withheld Receivables, totaling $350,464.13, for products ordered from and manufactured by Elysium.  Because both Elysium and InvaTech had billed Strides for the bulk product price of Elysium's products, and because InvaTech instructed Strides to remit the Withheld Receivables to it and not to Elysium, Strides is in a bind.  Upon information and belief, Strides will not transfer the Withheld Receivables to Elysium absent court order, even though the receivables are property of Elysium.

50.     Elysium is therefore forced to bring this action to recover the Misappropriated Receivables from InvaTech, and to seek an order declaring that the Withheld Receivables, held by Strides, are property of Elysium alone.

## CAUSES OF ACTION

### COUNT ONE
**(Declaratory Judgment That the Misappropriated Receivables
Are Property of Elysium and Not the Bankruptcy Estate)**

51.     Elysium repeats and realleges the preceding paragraphs as if fully set forth herein.

52.     ACI/Strides placed orders for pharmaceutical products from Elysium pursuant to the Supply Agreement, in the amount of the Misappropriated Receivables.

53.     In accordance with the Supply Agreement, Elysium fulfilled its obligations by manufacturing product at the request and specifications of ACI/Strides and then shipped the product to InvaTech for packaging in fulfillment of the orders.

54.     Elysium properly invoiced ACI/Strides for the Misappropriated Receivables, and at no point requested or authorized InvaTech to invoice ACI/Strides for the Misappropriated Receivables, let alone steal them.  Elysium therefore did not relinquish its rightful ownership interest in the Misappropriated Receivables to InvaTech at any time.

55.     InvaTech improperly invoiced ACI/Strides for the Misappropriated Receivables.

56.     Strides paid the Misappropriated Receivables to InvaTech, and did not remit payment for the same to Elysium.

57.     InvaTech refused to return the Misappropriated Receivables to Elysium.

58.     The Misappropriated Receivables transferred from Strides to InvaTech are the therefore the rightful property of Elysium, and not part of the Chapter 11 bankruptcy estate.

59.     Accordingly, Elysium is entitled to a Declaratory Judgment stating that the Misappropriated Receivables are property of Elysium only, that InvaTech does not have any right, title, or interest in the Misappropriated Receivables, and that the Misappropriated Receivables are therefore not part of the Chapter 11 bankruptcy estate.

**COUNT TWO**
**(Conversion)**

60.     Elysium repeats and realleges the preceding paragraphs as if fully set forth herein.

61.     The Misappropriated Receivables transferred from Strides to InvaTech are the rightful property of Elysium because Elysium received no consideration from InvaTech for Misappropriated Receivables for the products it sold and properly invoiced to ACI/Strides pursuant to the Supply Agreement.

62.     InvaTech wrongfully retained the Misappropriated Receivables because InvaTech gave no consideration to Elysium for bulk product price for the products manufactured and sold by Elysium for the benefit of Strides.

63.     Elysium was damaged by InvaTech's actions.

64.     Elysium seeks damages in an amount to be determined at trial, but no less than the amount of the Misappropriated Receivables.

### COUNT THREE
#### (Constructive Trust)

65.     Elysium repeats and realleges the preceding paragraphs as if fully set forth herein.

66.     In accordance with the Supply Agreement, ACI/Strides ordered products from Elysium, and Elysium delivered or caused to be delivered the purchased products to InvaTech for packaging.  Accordingly, ACI/Strides owed Elysium payment for the bulk product price.

67.     InvaTech wrongfully invoiced ACI/Strides, and Strides mistakenly paid InvaTech the Misappropriated Receivables.  Upon information and belief, InvaTech led Strides to believe that InvaTech was collecting the receivable on Elysium's behalf.

68.     Upon information and belief, the reason Strides remitted the Misappropriated Receivables to InvaTech is that it believed it was satisfying the amounts due to Elysium, and that InvaTech would promptly remit the Misappropriated Receivables to Elysium.  The Misappropriated Receivables were paid to InvaTech only to be held in trust for Elysium.

69.     InvaTech never had an ownership interest in the Misappropriated Receivables.

70.     Because InvaTech has no rightful ownership claim over the Misappropriated Receivables, InvaTech was unjustly enriched by receiving and retaining them.

71.     Elysium is therefore entitled to the creation of a constructive trust in the amount of the Misappropriated Receivables, and the Misappropriated Receivables should be exempted from the Chapter 11 bankruptcy estate.

## COUNT FOUR
### (Declaratory Judgment That the Withheld Receivables
### Are Property of Elysium and Not the Bankruptcy Estate)

72.     Elysium repeats and realleges the preceding paragraphs as if fully set forth herein.

73.     ACI/Strides placed orders for pharmaceutical products from Elysium pursuant to the Supply Agreement, in the amount of the Withheld Receivables.

74.     In accordance with the Supply Agreement, Elysium fulfilled its obligations by manufacturing products at ACI/Strides' request and specifications, and causing such products to be shipped to InvaTech for packaging.

75.     Elysium properly invoiced ACI/Strides for the Withheld Receivables pursuant to the Supply Agreement.

76.     InvaTech improperly invoiced Strides for the Withheld Receivables.  At no point did Elysium request or authorize InvaTech to issue invoices to Strides for Elysium's receivables, let alone steal them.

77.     Because it received invoices from both Elysium and InvaTech for Elysium's receivables, Strides will continue to refuse to remit payment for the Withheld Receivables to Elysium absent a declaration that the Withheld Receivables are the property of Elysium and not the Chapter 11 bankruptcy estate.

78.     Accordingly, Elysium is entitled to a Declaratory Judgment stating the Withheld Receivables are property of Elysium only, that InvaTech does not have any right, title, or interest in the Withheld Receivables, and that the Withheld Receivables are therefore not part of the Chapter 11 bankruptcy estate.

## PRAYER FOR RELIEF

WHEREFORE, Elysium respectfully requests that the Court enter judgment in its favor and against InvaTech and award relief as follows:

A.  Declaring that the Misappropriated Receivables are property of Elysium only;

B.  Declaring that InvaTech has no right, title, or interest in the Misappropriated Receivables;

C.  Declaring that the Misappropriated Receivables are therefore not part of the bankruptcy estate;

D.  Awarding Elysium damages for conversion in an amount to be determined at trial but in no event less than the Misappropriated Receivables;

E.  Ordering InvaTech to return the Misappropriated Receivables, or in the alternative, set aside sale proceeds in the amount of the Misappropriated Receivables following the asset sale in the Chapter 11 proceeding;

F.  Creating a constructive trust in the amount of the Misappropriated Receivables, and exempting the Misappropriated Receivables from the Chapter 11 bankruptcy estate;

G.  Declaring that the Withheld Receivables are property of Elysium only;

H.  Declaring that InvaTech has no right, title, or interest in the Withheld Receivables;

I.  Declaring that the Withheld Receivables are therefore not part of the bankruptcy estate;

J.  Granting Elysium's reasonable attorneys' fees, expenses, and costs incurred in this action to the extent permitted by law; and

K.  Granting such other and future relief as the Court deems just and proper.

Dated: March 25, 2026
Newark, New Jersey

**FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP**

*/s/ Elizabeth Bierut*
Elizabeth Bierut (N.J. Bar # 432072024)
Nora Bojar (*pro hac vice* forthcoming)
1 Gateway Center
Newark, NJ 07102-5311
(973) 877-6400
ebierut@fklaw.com
nbojar@fklaw.com

*Counsel for Plaintiff Elysium
Pharmaceuticals Ltd.*